IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURE PIETRO, | |
| Plaintiff, | Case No. 1:20-CV-6772 |
| | **Trial by jury demanded.** |
| CHICAGO TITLE INSURANCE COMPANY, LLC, | |
| Defendant. | |

## COMPLAINT

COMES NOW the Plaintiff, LAURE PIETRO, by and through her attorneys, Case + Sedey, LLC, and for her Complaint at Law against Defendant, CHICAGO TITLE INSURANCE COMPANY, LLC, states as follows:

### Introduction

1. This action arises under the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq., as amended ("ADA"), and the Family & Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., as amended ("FMLA").

### Jurisdiction and Venue

2. Jurisdiction is conferred on this Court by the above-named statutes, as well as by 28 U.S.C. § 1331. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 (b) and (c).

### The Parties

3. Plaintiff, Laure Pietro ("Plaintiff"), is a citizen of the United States and a resident of Orland Park, Cook County, Illinois. Plaintiff was at all relevant times employed by Defendant

Chicago Title Insurance Company, LLC and was an "employee" as defined by the aforementioned statutes.

4. Defendant, Chicago Title Insurance Company, LLC ("Defendant"), is a limited liability company registered and doing business in Chicago, Cook County, Illinois. At all relevant times, Defendant had more than fifty employees and was an "employer" as defined by the aforementioned statutes.

**Factual Allegations**

5. Plaintiff began working for Defendant in May of 2016 as an Underwriter Associate.

6. Plaintiff was successful in that role and consistently received positive performance reviews and feedback.

7. Plaintiff suffered from arthritis in her right knee for many years which substantially limited her in the major life activities of walking, standing, and bending her knee. Plaintiff walked with a visible limp because of this condition and suffered from severe pain.

8. In or around September of 2017, Plaintiff fell on her stairs at home and injured her arthritic knee. By that point, the arthritis was so advanced that the cartilage in her knee was mostly gone and her joint was operating bone on bone. Her fall severely increased the pain she suffered as a result of her arthritis. Thus, her doctors determined that she needed a total knee replacement.

9. At that time, Plaintiff had recently joined a new team, knew that they were busy, and did not want to disappoint them – so she continued to commute into work for a week after the fall. However, by the end of that week she was in so much pain that she could not walk.

10. Plaintiff was unable to schedule the knee replacement surgery for several more weeks. Thus, she reached out to her Team Lead, Ron Szopa, and asked to be allowed to work from home.

11. Mr. Szopa said that he would have to run the request past their Manager, Mike Lisanti, but that he would get back to her. Mr. Lisanti then called Plaintiff at home, with Human Resources Representative Karen Graziano on the line, and told her that she absolutely could not work from home and that the only way that would be allowed is if she had received a favorable review for the prior year. Plaintiff reminded Mr. Lisanti that she did have a favorable review for the prior year, but he falsely claimed that she did not. As a result, her requested accommodation was denied, and she was forced to choose between coming into work despite her pain or taking medical leave.

12. Thankfully, Plaintiff was able to get an injection in her knee that alleviated the pain until her surgery date. So, she was able to continue to work.

13. However, she was forced to take leave under the FMLA to undergo total knee replacement surgery in late January of 2018 and to recover. Plaintiff was expected to take twelve weeks of FMLA for this process, but she worked hard in physical therapy and was able to return in less than nine weeks.

14. Upon her return from FMLA leave, Plaintiff asked Mr. Lisanti to conduct her annual performance review. Her peers had been reviewed while she had been out, and they had all their performance reviews as well as related bonuses.

15. Plaintiff had to make this same request several times before Mr. Lisanti responded. When he ultimately did respond, Mr. Lisanti asked Plaintiff where in the handbook it said that she was entitled to a review and refused to conduct one. As a result, Plaintiff was the only person on her team not to receive a review in March/April of 2018 and the only one not to receive a bonus.

16. Plaintiff contacted an HR Representative in Defendant's parent company, Fidelity National Insurance, and informed her that Mr. Lisanti had failed to accommodate her disability

and, after she returned from FMLA leave, retaliated against her by refusing to conduct her review or award her a raise and bonus. The company conducted some investigation into Plaintiff's allegations, but despite that investigation, Defendant never gave Plaintiff a review, raise or bonus.

17. Then, in the fall of 2018, Plaintiff began experiencing severe migraines. When active, this condition substantially limited Plaintiff in several major life activities, including but not limited to concentrating, reading, seeing, hearing, driving, walking, and caring for herself.

18. Plaintiff applied for intermittent FMLA leave so that she would be able to take time off as necessary on days when her migraines were particularly bad. Defendant approved her intermittent FMLA leave in November of 2018.

19. In early 2019, Mr. Lisanti was promoted, and Mike Stroker took over as Manager in Plaintiff's department.

20. In March of 2019, Mr. Stroker issued Plaintiff a positive review and told her that he felt the team she had been supporting for some time was a good fit for her and that she was doing a "great job." Mr. Stroker also stated that both Mr. Szopa and Lisa Miles, the two Underwriters who Plaintiff supported, were really happy with her performance.

21. Plaintiff asked Mr. Stroker if she would be given a raise as a result of her strong performance, and he asked if she could be patient and give him until June of 2019 to figure that out. Plaintiff agreed.

22. In the spring of 2019, Plaintiff's migraines worsened considerably.

23. As a result, Plaintiff told Mr. Szopa about her condition and requested an accommodation. Specifically, she asked if she could work from home on those days that she suffered a migraine. Mr. Szopa agreed and granted her this accommodation.

24. In June of 2019, Ms. Pietro suffered from severe pneumonia and was hospitalized for approximately two weeks. She utilized FMLA leave during her time in the hospital.

25. Then, in August of 2019, Plaintiff followed up with Mr. Stroker about her request for a bonus and raise. Mr. Stroker asked her if she thought she deserved a raise and Plaintiff reminded him that she worked really hard and had just received a strong review from him earlier that year.

26. Mr. Stroker responded that while he knew Plaintiff suffered from migraines, she had too many "unplanned absences." In identifying Plaintiff's unplanned absences, Mr. Stroker listed several days which were approved as FMLA leave (or should have been) as well as days which Plaintiff was working from home as an accommodation for her disability. Indeed, Mr. Stroker could point to only one day amongst those he referred to as unplanned absences which was not FMLA-protected and/or related to Plaintiff's disability.

27. Mr. Stroker denied Plaintiff's requested bonus and raise because of her alleged unplanned absences. He said that he would revisit his decision in December.

28. Mr. Stroker also told Plaintiff during that meeting in August 2019 that she could no longer work from home as an accommodation for her migraines. He told Plaintiff that she had exceeded the amount of time she could work from home and that it "looks bad to the other teams."

29. Plaintiff reminded Mr. Stroker that another Underwriting Associate on Plaintiff's team who had since been promoted to Underwriter had always had a dedicated one day per week working from home and was regularly allowed to work from home whenever else she needed without any limit being imposed on her.

30. Mr. Stroker responded that "that doesn't matter" and reiterated that it would look bad to other teams to allow Plaintiff to continue working from home. Mr. Stroker said he would talk to Mr. Szopa about this change and ended the meeting.

31. On September 19, 2019, Plaintiff emailed Mr. Stroker and complained that he had improperly used her FMLA-leave and her disability-related work-from-home accommodation against her in deciding not to issue her a raise. Mr. Stroker did not respond to this communication.

32. Thus, on September 25, 2019, Plaintiff sent an email to Patrick Mortimer, an HR Representative in Respondent's parent corporation, Fidelity National Title Insurance Company, in which she reported that she believed she was being discriminated against on the basis of her disability and denied an accommodation in violation of the ADA. Neither Mr. Mortimer nor anyone else at Defendant or Fidelity National responded to that communication.

33. Instead, on September 27, 2019, Mr. Stroker and Ms. Graziano met with Plaintiff and reiterated that Plaintiff was denied a raise because of her "unplanned absences." Mr. Stroker told Plaintiff to stop asking to work from home because she was "no longer entitled to do so."

34. Mr. Stroker also used this meeting to criticize Plaintiff's performance for the first time in her employment with Defendant. Specifically, Mr. Stroker stated that Plaintiff was "disorganized." The only example he gave in support of this claim was one stray comment in Plaintiff's 2017 review which related to the manner in which she organized her email inbox (not to the manner in which Plaintiff actually performed her responsibilities).

35. Mr. Stroker demanded that going forward, Plaintiff chart her time and work activities daily and said that he was going to review her time with an Underwriter. Mr. Stroker also announced that Plaintiff would no longer be given the high level of work she had previously handled.

36. Plaintiff emailed Mr. Stroker (copying Ms. Graziano) later that evening and complained that she also believed she was being treated adversely because of her use of FMLA-protected leave. Neither Mr. Stroker nor Ms. Graziano responded to her email.

37. On October 10, 2019, Plaintiff made a more formal complaint of disability discrimination, failure to accommodate, and retaliation in violation of the ADA as well as discrimination and retaliation in violation of the FMLA via a letter to Mr. Mortimer and Ms. Graziano from Plaintiff's legal counsel.

38. On October 15, 2019, just two business days later, Mr. Stroker and Ms. Graziano met with Plaintiff and terminated her, asserting that their decision was based on her attendance. When Plaintiff asked what they meant by attendance, Ms. Graziano stated that Plaintiff had exceeded the number of days her doctor certified she might be out per month under her intermittent FMLA leave.

## Administrative Prerequisites

39. On October 31, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination, failure to accommodate and retaliation against Defendant (Charge No. 440-2020-00752).

40. Plaintiff received her Notice of Right to Sue from the EEOC on August 20, 2020.

## COUNT I
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA

41. Plaintiff incorporates by reference the preceding paragraphs 1-40 as though fully set forth in this Count I.

42. Plaintiff was a qualified individual with two disabilities, arthritis in her knee and severe migraines.

43. Plaintiff disclosed her disabilities to Defendant and repeatedly requested a reasonable accommodation in the form of being allowed to work from home when her disabilities were active.

44. The accommodations requested were reasonable and would not have posed an undue burden on Defendant.

45. Defendant denied Plaintiff's requested accommodations without justification and without engaging in the interactive process.

46. As a direct and proximate result of said acts, Plaintiff has suffered loss of employment, loss of income and other employment benefits, reputational harm, great expense, emotional distress, humiliation, embarrassment, and future lost income and benefits.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant failed to accommodate her in violation of the ADA;

B. Enter a finding that Defendant's failure to accommodate her was done with malice and reckless indifference for Plaintiff's rights under the ADA;

C. Award her lost wages, lost benefits, and front pay;

D. Award her compensatory and punitive damages;

E. Award her prejudgment interest;

F. Award her reasonable attorneys' fees and costs; and

G. Award her any further relief that the Court may deem just and appropriate.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

47. Plaintiff incorporates by reference paragraphs 1-40 as though fully set forth in this Count II.

48. Plaintiff was a qualified individual with two disabilities, arthritis in her knee and severe migraines.

49. Defendant discriminated against Plaintiff based on her disabilities and treated her differently than her non-disabled counterparts when it repeatedly failed to provide her with pay increases and bonuses, subjected her to increased scrutiny, and, ultimately, terminated her employment.

50. As a direct and proximate result of said acts, Plaintiff has suffered loss of employment, loss of income and other employment benefits, reputational harm, great expense, emotional distress, humiliation, embarrassment, and future lost income and benefits.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant discriminated against her based on her disability in violation of the ADA;

B. Enter a finding that Defendant discriminated against her with malice and reckless indifference for Plaintiff's rights under the ADA;

C. Award her lost wages, lost benefits, and front pay;

D. Award her compensatory and punitive damages;

E. Award her prejudgment interest;

F. Award her reasonable attorneys' fees and costs; and

G. Award her any further relief that the Court may deem just and appropriate.

## COUNT III
## RETALIATION IN VIOLATION OF THE ADA

51. Plaintiff incorporates by reference paragraphs 1-40 as though fully set forth in this Count III.

52. Plaintiff engaged in protected activity under the ADA when she requested reasonable accommodations and when she repeatedly complained to Defendant about her reasonable belief that the company was failing to accommodate her and discriminating against her in violation of the ADA.

53. Defendant retaliated against Plaintiff when it failed to provide her a pay increase and bonus, subjecting her to increased scrutiny, and, ultimately, terminated her employment.

54. As a direct and proximate result of said acts, Plaintiff has suffered loss of employment, loss of income and other employment benefits, reputational harm, great expense, emotional distress, humiliation, embarrassment, and future lost income and benefits.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant retaliated against Plaintiff in violation of the ADA;

B. Enter a finding that Defendant retaliated against her with malice and reckless indifference for Plaintiff's rights under the ADA;

C. Award her lost wages, lost benefits, and front pay;

D. Award her prejudgment interest;

E. Award her reasonable attorneys' fees and costs; and

F. Award her any further relief that the Court may deem just and appropriate.

## COUNT IV
## DISCRIMINATION/RETALIATION IN VIOLATION OF THE FMLA

55. Plaintiff incorporates by reference paragraphs 1-40 as though fully set forth in this Count IV.

56. Plaintiff was an eligible employee as defined by the FMLA.

57. Plaintiff exercised her rights under the FMLA when she applied for and took FMLA-protected leave, including but not limited to leave related to her arthritis, her migraines, and her hospitalization with pneumonia.

58. Defendant knowingly, intentionally and willfully discriminated and/or retaliated against Plaintiff for exercising her rights under the FMLA when it repeatedly refused to issue her merit-based pay increases and/or bonuses, subjected her to increased scrutiny, and, ultimately, terminated her employment.

59. As a direct and proximate result of said acts, Plaintiff has suffered loss of employment, loss of income and other employment benefits, reputational harm, great expense, and future lost income and benefits.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant discriminated and/or retaliated against her in violation of the FMLA;

B. Enter a finding that Defendant engaged in the discrimination and/or retaliation intentionally and/or willfully;

C. Award her lost wages, lost benefits, and front pay;

D. Award her liquidated damages;

E. Award her reasonable attorneys' fees and costs; and

F. Award her any further relief that the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues herein.

Respectfully Submitted,

LAURE PIETRO

By:   /s/    Kate Sedey
      One of Plaintiff's Attorneys

Kate Sedey
Kristin M. Case
Case + Sedey, LLC
250 South Wacker Dr., Ste. 230
Chicago, Illinois 60606
Tel. (312) 920-0400
Fax (312) 920-0800
ksedey@caseandsedey.com